Good morning. Also, Social Security is Johnson against Berryhill. We'll hear first from Mr. Sellers. Thank you. Good morning. May it please the Court, Counsel? Tamara Johnson seeks reversal of a flawed administrative law judge's decision denying her claim for disability benefits and supplemental security income. The ALJ's decision was based on logical, factual, and legal errors and requires reversal and remand. My name is Joseph Sellers, appearing on behalf of Ms. Johnson today. After she was denied at the initial and reconsideration levels of SSA's adjudicatory process, Ms. Johnson submitted new evidence from her more recent treatment. That evidence included her first lumbar spine MRI, new diagnoses of radiculopathy, sacroiliitis, peripheral neuropathy, and carpal tunnel syndrome in her left dominant hand. She also submitted an opinion from Dr. Hedrick, who opined, in essence, that she could not perform full-time competitive work. Because this evidence was largely generated after they reviewed the evidence at the initial and reconsideration levels, the state agency consultants were not able to review this evidence in denying her claim. Now, didn't the Appeals Council, somebody said this evidence wouldn't have made any difference to them anyway? That's the government's argument, yes. And our argument in response to that is that those doctors had no idea that she had these four additional impairments that were discovered after they submitted their opinions. So they couldn't even begin to understand that she had problems with her left hand, her dominant hand. They didn't know that she had radiating pain down her left leg confirmed. They didn't know that she had peripheral neuropathy in her feet. They didn't know all of these impairments that would add additional limitations. So the government's argument that the ALJ's failure to secure an updated opinion did not prejudice Ms. Johnson is baseless, because these additional impairments almost by definition bring additional limitations, which should have been considered and should have been accounted for. And that's the clearest example of the ALJ's poor attempt to play doctor in this case and review this new evidence on her own without guidance from a medical professional. So would it have been enough in your view to send this back to one of the state reviewers? As opposed to having a medical expert at the hearing? Right, as opposed to having a more full-blown examination ordered. I think it would have certainly been beneficial to have, if she had reservations about the most up-to-date opinion from Dr. Hedrick, it would have benefited both the ALJ and Ms. Johnson to have expert guidance on what this new evidence meant regarding Ms. Johnson's functional capacity, subjective complaints, and her claim in general. Whether or not that would have been enough is unclear based on how well the doctor reviewed the medical records, but it certainly would have helped and would have removed the prejudice from Ms. Johnson. The ALJ also rejected the most up-to-date treating, sorry, not necessarily a treating doctor, but the most up-to-date medical opinion from a source who had examined Ms. Johnson, and her rejection of that doctor's opinion was error. She failed to cite specific legitimate reasons constituting good cause for doing so. Instead, she cited broadly to what she alleged were inconsistencies with other evidence in the record, cited her own understanding of Ms. Johnson. So do we know exactly what these contradictions are? We don't know from the ALJ's decision, Your Honor. The government made an attempt to contradict Dr. Hedrick's opinion with Dr. Kemenany's examination, but it failed to explain how those two were inconsistent. It cited no medical opinion to that effect. It cited no medical evidence to that effect. You think they're reconcilable. Can you explain why? I think at the very least, even if Dr. Kemenany's generally normal examination is inconsistent with Dr. Hedrick's opinion, all that shows is that Ms. Johnson's condition worsened after Dr. Kemenany's examination, because after November 2012, when she was examined by Dr. Kemenany, we have objective physical examinations that support Dr. Hedrick's opinion. So they're reconcilable at the very least in that sense. The time span. Right. And ALJs are required to look at any 12-month period before them in which a claimant could be considered disabled. So that worsening, if that's all that that shows, should have been considered. But the ALJ did not consider that. So that a possible outcome here could be a partial disability during part of the period being claimed? Correct. A later onset date, as opposed to her original alleged onset date. Well, as it is, we're already, what, three and a half years beyond Hedrick's opinion. Yes, Your Honor. So we don't know what her condition is now, I guess. Not from the record, no. No. Well, the agency's entitled to revisit these things periodically, as I recall. There's sometimes that people start on disability and they graduate off of it, so to speak. Yeah, there is a continuing disability review process that, in theory, everybody's supposed to undergo. But it doesn't happen for everybody. And in follow-up with Ms. Johnson, she was approved on a later application. So she was? Yes. Okay. With a later onset date? Yes. 2014, I believe. Is that the current situation? Yes. As far as I know, she's still receiving benefits. What are we doing here? We're looking at the period before that. So you want the money for the period before that. She would get a financial award. She would be entitled to the back pay. So there's dollars on the table for her. Yes. A substantial amount for her. Given her solid work history, her primary insurance amount, which is the monthly benefit she would get, is substantial for her. If there are no further questions. Okay. You can save the rest of your time for rebuttal, if you'd like. Thank you. That's fine. Ms. Schacht. Good morning. May it please the Court. My name is Meredith Schacht, and I represent the Acting Commissioner of Social Security. The ALJ here provided specific legally supported reasons for her determination that Dr. Hedrick's opinion was entitled to little weight. That determination and her residual functional capacity finding was supported by substantial evidence and should be affirmed. I'd like to address a couple points just off the bat that were raised by counsel and I think could use a little clarification. First off is with regard to what evidence was available to the state agency physicians. The state agency physicians in reviewing the record I saw had Dr. Miller's records. Those were presented to the state agency physician, Dr. Sands, on reconsideration. He had those records that reflected Dr. Miller's assessment, both of Ms. Johnson's diagnoses and his observations of her abilities. He had the MRI result, and he provided an opinion that was consistent with the earlier state agency opinion and consistent with the residual functional capacity here. With regard to the purported left-hand limitations that are reflected in Dr. Hedrick's opinion in this case, there are no records, no treatment records that reflect any finding of carpal tunnel syndrome or the Phelan's test or the Tinnell's test that are reflected or referenced in Ms. Johnson's reply brief. Those are not reflected anywhere in the treatment notes. The only place that those show up are in Dr. Hedrick's opinion. So there's no reason to think that seeing the additional treatment notes would have changed the impact, would have had an impact on the opinions. And in that regard, Your Honor asked about whether the appeals counsel had commented on the additional evidence. It was not additional evidence after the ALJ decision. All of the evidence was available to the ALJ. The ALJ had Dr. Miller's records. The ALJ had Dr. Hedrick's records, which were only two dates that he saw Ms. Johnson. But he did actually examine her. He did. He examined her on one date, and he provided injections on another date. So those were the two dates that he saw her. She was seen by other people in that office on other dates. That's the way medical care is typically delivered these days. People are lucky to see a doctor sometimes. That may be true, but it wasn't the nurse practitioner who provided the opinion here, although there was a nurse practitioner who saw her more regularly than other people in the office. That nurse practitioner didn't offer an opinion here, and there's no indication that Dr. Hedrick's or any other physician reviewed those notes or examined them in connection with the opinion that was given. Excuse me. In this case, the ALJ did carefully examine Dr. Hedrick's opinion and gave very specific reasons in her decision for why she assigned little weight to those opinions reflected in the worksheet that Dr. Hedrick signed. The ALJ noted that Dr. Hedrick only saw Ms. Johnson on two occasions and didn't have a longstanding relationship with her. And then the ALJ did identify the ways in which she found the opinions inconsistent with Dr. Hedrick's own treatment records, which were that the treatment records, Dr. Hedrick's treatment records reflected improvement, as did the treatment records from each of the nurse practitioners who saw Ms. Johnson in that practice. Regular improvement. Again, we have this pagination issue, but it's page 38 of the appendix to the blue brief, and I'm trying to figure out what page it is. It's page 9 of 11 for the ALJ's opinion. At the bottom, she starts explaining why she gives little weight to Dr. Hedrick's opinion. But she, aside from the fact that they're the two encounters, which I'm not sure means a whole lot, she attaches negative weight to the idea that she should have a low-impact exercise program and that, you know, she, medical source statement, actually this is now somebody else, but anyway, I don't see very many reasons. I mean, you can improve and still be not doing well enough to work. There's a 40 percent, I mean, this 40 percent number is thrown around a lot, 40 percent improvement in ambulation, housework, and sleeping. So you sleep better? I don't know where that ties into ability to do work. So the important thing to keep in mind is what Dr. Hedrick opined, which was that Ms. Johnson could sit for 5 to 10 minutes at a time, that was it, could stand for 5 minutes, had limitations in every aspect of using her arms. And then Dr. Hedrick, in his treatment notes, said that she should undertake low-impact cardiovascular exercise. The ALJ reasonably considered that it would be very difficult for somebody who could stand for only 5 minutes and who could only sit for 5 minutes to undertake a regular regime of cardiovascular exercise. But he doesn't really define it. I mean, I think low-impact cardiovascular activity, and I think maybe he wants her to walk from one end of her house to the other, and then sit down, and then get up and walk from one end of her house to the other again. That would be low-impact cardiovascular activity, and walking is actually, it turns out to be, in fact, an excellent cardiovascular activity. It could be if one could sustain it for more than 4 minutes. Well, but maybe you start with the 4 minutes and build up your strength. He's trying to help her get better. That's certainly possible, Your Honor. And he listed, I'm sorry, the ALJ listed other aspects, though, of the treatment notes that she also found were inconsistent or not supportive of Mr. Hedrick's opinion. She noted that Dr. Hedrick said that the medications were helping Ms. Johnson and that they were effective in allowing her to maintain her ability to work and perform her daily activities. But her pain level, I mean, she still, though, is reporting, even with some improvement. I mean, I've known people who've improved but are still feeling terrible. That's certainly possible. You can go from a 9 out of 10 pain to a 7 out of 10 pain. Well, that's an improvement, but maybe not enough. That could be possible, Your Honor, but the nurse practitioners at this very same practice decreased her dosage of medication over time, and Dr. Hedrick himself said that he believed that they would be able to cease pain medication with exercise and diet changes. That's not an indication of somebody who's severely limited. The ALJ reasonably considered those, and the ALJ reasonably considered that the opinions in Dr. Hedrick's worksheet were also inconsistent with other evidence, including evidence from Ms. Johnson's other treating provider, Dr. Miller, who indicated a normal musculoskeletal exam, did not note any limitations with her arms. Is there any reason that normal musculoskeletal means that everything else is fine? Well, her complaints here are musculoskeletal related to her... But the structure and the pain, the postural issues, do we know that those are linked? Dr. Miller linked them to degenerative disc disease, which would be a musculoskeletal impairment. And is there any question that she has the disc disease? No, the ALJ found that she had degenerative disc disease. She has the disc disease, yes. So she may have an anatomical musculoskeletal system that's, I don't know, it's flawed. So what Dr. Miller recorded on his treatment notes was that she had a normal musculoskeletal exam, meaning that her musculoskeletal system was functioning fine on that day. Right, but it doesn't mean she didn't have the disc disease. That's true. It was acknowledged that she had disc disease. The diagnosis of disc disease is not per se disabling. It's the impact of the disc disease. Right, absolutely. And that is what the ALJ considered and what was reflected in Dr. Miller's notes. The impact of the disc disease did not reflect impairments in her musculoskeletal exam. That was largely the same in the notes from Dr. Hedrick and from the nurse practitioners there, that she had full muscle strength. She had generally good functioning. She was able to sit comfortably. She was able to walk into the room. So what the ALJ was considering was not the diagnoses per se, because those in this case were not per se disabling. The ALJ was looking at evidence of the impact of those diagnoses. And counsel said that these diagnoses almost by definition imposed limitations, but that's not the case. The ALJ was required and did look at the evidence of what the actual limitations were reflected in the actual evidence. It was the ALJ's obligation, it was her duty to examine the treatment notes, and that's what she did here, and she fairly assessed that Dr. Hedrick's opinion was unsupported by and inconsistent with those other treatment notes. And she provided a fair amount of detail as to what those inconsistencies were, and surely the detail that she provided meets what this court has called a minimal standard, a lax standard, that if she has demonstrated she's considered the factors, her decision should be affirmed. And so we would ask that you do that here. All right. Thank you. Thank you. Anything further, Mr. Sellers? Just two things, Your Honor. Counsel asserts that the state agency doctor at the reconsideration level had Dr. Miller's records, but there's no mention of an MRI in his review of those records, and at the time that he produced his opinion at the reconsideration level, he could only have had one of Dr. Miller's records based on time alone. So the fact that he had one note from Dr. Miller does not negate the fact that after he produced his opinion. She. It was a woman. Dr. Sands. Oh, I thought you were talking about the ALJ. Or Dr. Vaughn, I don't remember. Never mind. Sorry, the reconsideration doctor. Okay. After that opinion was produced, the bulk of Miss Johnson's treatment was produced into evidence, and that evidence consists of additional impairments, additional positive objective findings, and a positive MRI, which the record does not show the state agency had any access to whatsoever. I suppose the record doesn't show what her new onset date is either, right? No, it does not, Your Honor. The government also argues that there is no evidence of carpal tunnel problems until the opinion. They're still in the opinion. It's still evidence of a problem with her wrist in her dominant hand. Regardless of whether or not it popped up at the end of the period before the ALJ or at the beginning, there's still evidence of problems with her wrist, and the ALJ still has to address that evidence, and she failed to do so. She failed to address that evidence. She failed to address the evidence of sacroiliitis. She failed to address the evidence of radiculopathy. All of it gone because she took it upon herself to review the records by herself and did a shoddy job of it. With regard to Dr. Hedrick's opinion, Your Honor, it's correct. Improvement is almost entirely relative. As you said, she's still complaining of extensive amounts of pain, even with the 40% improvement. With regard to the exercise, as you were alluding to, it was to treat deconditioning, a problem someone has after they don't get enough physical activity, which is consistent with her allegations of reduced physical activity and reduced physical capacity. That her doctor wanted her to get better doesn't mean she's not disabled. It just means he's trying to do his job. There's never, though, any definition beyond just the statement low impact. That's correct. It's vague, as can be in this record, as is the statement about maintaining ADLs and the ability to work. With the vague nature of it, it's just the ALJ's conjecture as to what it meant, and you're not allowed to deny a claim based on conjecture. You have to base it on evidence, and the ALJ failed to do so here. Thank you. All right. Thank you very much. Thanks to both counsel to take the case under advisement. Our sixth case for this morning is